AO 91, Rev. 11/82 (D. Cohen Authorizing) **CRIMINAL COMPLAINT** # 08- 188

| United States District Court | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>George Georgiou | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br>08-1220-M |

Complaint for violation of Title 15, United States Code, §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5

| NAME OF JUDGE OR MAGISTRATE<br>Honorable THOMAS J. RUETER | OFFICIAL TITLE<br>U.S. Magistrate Judge | LOCATION<br>Philadelphia, PA |
|---|---|---|
| DATE OF OFFENSE<br>In or about April 2008 to September 17, 2008 | PLACE OF OFFENSE<br>Philadelphia, PA | ADDRESS OF ACCUSED (if known)<br>Toronto, Canada |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

From in or about April 2008 until on or about September 17, 2008, in the Eastern District of Pennsylvania and elsewhere, defendant **GEORGE GEORGIOU** knowingly and willfully, directly and indirectly, by use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchase and sale of publicly traded stocks, by (i) employing devices, schemes and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon members of the investing public.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT (official title)
Corey Riley
OFFICIAL TITLE
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence.

SIGNATURE OF MAGISTRATE
Honorable THOMAS J. RUETER, United States Magistrate Judge

DATE
9-18-08

1) See Federal Rules of Criminal Procedure rules 3 and 54.

## AFFIDAVIT

I, COREY RILEY, being duly sworn, deposes and states:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Philadelphia, Pennsylvania field office. I have been employed as a special agent for approximately four years. Prior to joining the FBI, I worked in the securities industry. In my present capacity, I work principally on investigations involving white collar crimes, including securities frauds.

2. The information contained in this affidavit has been personally reviewed by me. I am personally knowledgeable regarding the facts and circumstances herein described through my personal participation in this investigation and my personal review of investigative activities and materials provided by other law enforcement and regulatory agencies.

3. This affidavit is submitted in support of a complaint and warrant charging GEORGE GEORGIOU with securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5. This affidavit does not include all facts known to me, but rather facts sufficient to support these charges.

4. GEORGIOU is a Canadian citizen and a former registered representative with the Investment Dealers Association of Canada (the "IDA"). For conduct unrelated to that described here, the IDA banned GEORGIOU from acting as a broker/dealer for a period of ten years from January 31, 1995 to January 31, 2005 and imposed a $50,000 fine as disciplinary sanctions. GEORGIOU is no longer licensed by the IDA, yet he has continued to make substantial investments in stocks publicly traded on the United States markets as well as Canadian real estate.

5. From at least in or about April 2008 through the present, GEORGIOU has been involved in a conspiracy to manipulate the share prices of two companies known to me and identified here as "Stock A" and "Stock B," which are publicly traded in the United States on the "pink sheets," an inter-dealer quotation service that provides quotations, prices, and financial information for certain over-the-counter securities. These types of stocks are also sometimes referred to as "microcap" or "penny stocks." Many pink sheet stocks are thinly traded and are susceptible to price manipulation by those controlling the majority of the stock. In this case, GEORGIOU and others artificially inflated and/or sought to artificially inflate the price of these stocks by causing manipulative market activity that was designed to appear to be the product of free and fair market forces.

1

6. The United States Securities and Exchange Commission (the "SEC") is an independent agency of the United States which is charged by law with the duty of protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities. Among the national securities markets regulated by the SEC are the New York Stock Exchange, the American Stock Exchange and the pink sheets.

7. On or about April 17, 2008, GEORGIOU held a meeting in Chicago, Illinois to discuss the manipulation of Stock A and Stock B with an individual who was secretly cooperating with law enforcement ("Individual A"). Individual A has previously worked with GEORGIOU to manipulate other publicly traded securities. This conversation and all other conversations discussed in this affidavit were recorded. At this meeting, GEORGIOU stated that he was being granted a large amount of Stock A in order to handle "promotion" and that the company was willing to put up money for a ten million piece mail campaign. Stock manipulators frequently employ mass mailings to generate interest and awareness in a stock they intend to manipulate. GEORGIOU stated that he was working with a group to actively manipulate Stock A and suggested that Individual A could act as a "front" to bid on Stock A shares held in GEORGIOU's wife's name in order to further manipulate the price.

8. GEORGIOU also stated that he would provide Individual A with the shareholder list for Stock A, which, in my experience, is often used by stock manipulators in order to keep track of who else is buying and selling the target stock. GEORGIOU also indicated that he would produce a stream of press releases, which, in my experience, is frequently used as a pretext to justify the increased volume in a stock to other investors and regulators. Approximately 15,000 shares of Stock A were traded that day and the stock closed at approximately 30 cents per share. As discussed below, over the next few months, GEORGIOU and others artificially increased Stock A's price by more than 800%.

9. During the same meeting, GEORGIOU discussed manipulating Stock B, of which he claimed to control fifty percent (50%) of the free trading shares. GEORGIOU agreed to pay an undercover FBI agent (the "UC"), who Individual A had previously introduced to GEORGIOU as someone who had the ability to control blocks of securities brokers and other individuals who would make purchases in publicly traded stocks and then "park," or hold, the stock in order to artificially inflate a stock's price. GEORGIOU understood that the UC charged an approximately 20% fee for his/her services, a portion of which was purportedly to be used to pay secret bribes to brokers in order to cause them to make purchases of stock in their clients' accounts.

2

10. On or about May 29, 2008, GEORGIOU had a telephone conversation with Individual A in which GEORGIOU stated that he had hired a group to help manipulate Stock A and that they had started on Friday, May 23, 2008 and would be going "full force" the following week. In fact, over 120,000 shares of Stock A were traded on May 23, 2008, which represented a 500% increase in trading volume from the previous day. By May 23, 2008, GEORGIOU and others successfully raised Stock A's price to 77 cents, or more than double its stock price from April 17, 2008. On May 30, 2008, the trading volume of Stock A nearly tripled to almost 320,000 and Stock A closed at $1.10.

11. On or about May 30, 2008, GEORGIOU had a telephone conversation with Individual A in which GEORGIOU explained that he and his group were going to try to take Stock A to $3 per share. That same day, the trading volume in Stock A increased by over one million shares from the previous day to approximately 1,470,000 shares traded and the stock price increased to $1.31.

12. By June 18, 2008, Stock A's price was up to $2.55 on the strength of over 8 million shares traded over two days. By the beginning of July, however, Stock A's share price had plummeted to 85 cents. In my experience this is consistent with a stock manipulation or "pump and dump" scheme where the manipulators artificially run up a stock's price and then sell at a profit.

13. GEORGIOU and Individual A had a number of subsequent telephone conversations in which they discussed getting the UC involved in manipulating Stock A and Stock B and set up a meeting on August 13, 2008 in Philadelphia to discuss their plan.

14. On or about August 13, 2008, GEORGIOU met with Individual A and the UC in Philadelphia to discuss manipulating Stock A and Stock B. At this meeting, GEORGIOU bragged that he and others had successfully manipulated Stock A from fifty cents to two dollars and fifty cents per share and that they would be starting another manipulation campaign soon. GEORGIOU also discussed manipulating Stock B and indicated that he and others were going to start a manipulation campaign in the fall in conjunction with press releases and that they intended to spend three to four times the amount they had spent on Stock A. GEORGIOU stated that the objective was to move Stock B's share price from approximately $1 to $2.50-$3 per share by the spring. During this conversation, GEORGIOU shared non-public information about Stock B in order to demonstrate his control over the company. GEORGIOU also indicated that he wanted the UC to buy between $5 million and $10 million worth of Stock B during the campaign and agreed to pay him a twenty-five percent (25%) kickback,

3

a portion of which GEORGIOU understood would be used to bribe brokers in order to cause them to purchase and hold Stock B in their clients' accounts. GEORGIOU demanded to get 5% of his kickback returned if the UC failed to buy at least $5 million in Stock B.

15. GEORGIOU also informed Individual A and the UC that Stock A would be actively manipulated again soon and that any purchases the UC did in Stock A would have to be coordinated with GEORGIOU as an open market cross trade because there was now too much uncontrolled stock in the market. In my experience, this means that GEORGIOU would sell the UC stock he controlled as a set price to ensure that other investors who were not in on the scheme could not sell their stock and lower Stock A's price.

16. GEORGIOU and the UC agreed that the UC would make a relatively small purchase in Stock B and GEORGIOU would then wire the kickback in order to test the process before the more significant trading occurred. Individual A requested that GEORGIOU provide them with news about Stock B prior to its public release to that they could prove they had control of the Stock B to the brokers they were purportedly working with on this manipulation scheme.

17. On or about September 2, 2008, GEORGIOU shared non-public news that Stock B was going to release the following day with Individual A.

18. On or about September 3, 2008, Stock B released the news that GEORGIOU had provided the day before and the UC purchased approximately $20,000 worth of Stock B using FBI funds.

19. On or about September 11, 2008, GEORGIOU caused approximately $5,000 to be wired into an account maintained by the FBI in Philadelphia as a kickback for the Stock B purchases caused by the UC.

20. On or about September 15, 2008, GEORGIOU and the UC spoke via telephone and agreed to meet in Philadelphia on September 17, 2008 to discuss how the manipulative purchases in Stock B would be coordinated.

21. On or about September 17, 2008, GEORGIOU traveled to Philadelphia to meet the UC and they agreed that the UC would begin $10 million in buying of Stock B the next day. GEORGIOU stated that he would make sure Stock B issued press releases to justify the vastly increased trading volume resulting from this scheme. GEORGIOU also proposed manipulating other stocks while this scheme was ongoing.

22. There are approximately 89,000,000 outstanding shares of Stock A and approximately 104,000,000 outstanding shares of Stock B. Thus, GEORGIOU's schemes which artificially inflated, or attempted to artificially inflate, the share prices of these stocks involved hundreds of millions of dollars.

23. Based on the above facts and based on my experience investigating securities fraud, I believe that probable cause exists for the issuance of a complaint and warrant charging GEORGE GEORGIOU with violations of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

COREY RILEY
Special Agent
Federal Bureau of Investigation

SWORN AND SUBSCRIBED
BEFORE ME THIS:
18th Day of September 2008.

BY THE COURT:

HONORABLE THOMAS J. RUETER
Chief, United States Magistrate Judge